IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HERBERT YOUNG JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-05-1633 |
| | § | |
| JO ANNE BARNHART, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER
## GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 6), and Memorandum in Support (Document No. 7), Plaintiff's Motion for Summary Judgment (Document No. 17), and Memorandum in Support (Document No. 18), and the Defendant's Reply thereto (Document No. 18). Having considered the motions, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment (Document No. 17) is GRANTED, Defendant's Cross-Motion for Summary Judgment (Document No. 6) is DENIED, that the decision of the Commissioner is REMANDED for further proceedings.

---

[1]On August 24, 2005, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 10.

## I. INTRODUCTION AND BACKGROUND

Herbert Young ("Young") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner denying his applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). Young alleges that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Janis Estrada, committed an error of law in failing to comply with the January 12, 2004, Order issued by the Appeals Council. Specifically, Young contends that ALJ did not discuss or refer to "an ejection fraction of 15%" or restriction of "difficulty walking more than 10-15 minutes due to shortness of breath," which was referenced in the Appeals Council's Order. Further, Young alleges that the ALJ did not discuss the impact of this restriction upon his ability to work. The Commissioner, in contrast, contends that there is substantial evidence in the record to support the ALJ's decision, that the decision comports with applicable law, that any deficiencies in the ALJ's written decision constitute harmless error and that the decision should be affirmed.

## II. ADMINISTRATIVE PROCEEDINGS

On May 14, 2001, Young protectively filed for disability insurance benefits ("DIB") and for supplemental security income ("SSI") claiming he has been disabled since date of April 1, 1993, due to heart disease, arthritis of the lower back, deafness in the right ear, depression, confusion, and high blood pressure. (Tr. 26, 93-95, 96-99,107, 463-466)[2]. Young was last insured for purposes of Title II disability benefits on December 31, 1999. (Tr. 26).

---

[2]"Tr." refers to the transcript of the administrative record.

Young's claims were denied at the initial and reconsideration stages.  (Tr. 37-38, 60-65).

Following the denial, Young requested a hearing before the ALJ , which was granted. On January,

23, 2003, the ALJ  issued an unfavorable decision. (Tr. 26).

Young requested that the Appeals Council review the ALJ's decision. On January 14, 2004,

the Appeals Council granted Young's request for  review, vacated the ALJ's decision, and remanded

the case for resolution of several issues. (Tr. 80-82).   According to the Appeals Council, a remand

was appropriate because of the ALJ failed to consider the following:

> A consultative examination in September 2001 noted that the claimant would have
> difficulty walking more than 10-15 minutes due to shortness of breath (Exhibit 7F).
> In October 2002, it was noted that the claimant had an ejection fraction of 15%
> (Exhibit 12F).  The Administrative Law Judge did not discuss these restrictions or
> their impact on the claimant's ability to work.

> The decision found that the claimant did not have any mental limitations.  However,
> a consultative examination in September 2001 noted that the claimant had a Global
> Assessment Functioning (GAF) of 55, which represents moderate symptoms.  The
> Administrative Law Judge did not discuss the opinion or provide rationale as to why
> he was not accepting it (20 CFR 404.1527 and 416.927).  (Tr. 80).

In addition, the Appeals Council instructed the ALJ to take the following actions:

> Upon remand the Administrative Law Judge will:

> - Give further consideration to the treating and examining source opinion
>   pursuant to the provisions of 20 CFR 404.157 and 416.927 and Social Security
>   Rulings 96-2p and 96-5p and explain the weight given to such opinion
>   evidence. As appropriate, the Administrative Law Judge may request the
>   treating and examining sources to provide additional evidence and/or further
>   clarification of the opinions and medical source statement about what claimant
>   can still do despite the impairments (20 CFR 404.1512 and 416.912). The
>   Administrative Law Judge may enlist the aid and cooperation of the claimant's
>   representative in developing evidence from claimant's treating sources.

> - Obtain additional evidence concerning the claimant's cardiac and mental
>   impairments in order to complete the administrative record in accordance with
>   the regulatory standards regarding consultative examinations and, existing
>   medical evidence (20. CFR 404. 1512-1513 and 416. 912-913). The additional

evidence will include updating clinical medical records from the claimant's treating sources and consultative cardiac and psychiatric examinations and medical source statements about what the claimant can still do despite the impairments.

- Further evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in CFR 404. 1520a(c) and 416.920a(c).

- Give further consideration to the claimants's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security ruling 85-16 and 96-8p).

- Further, if necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment (20 CFR 1527(f) and 416. 927(f) and Social Security Ruling 96-6p).

- Obtain evidence from a vocational expert to clarify the effect of the assessed limitation on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404. 1566 and 416.966). Further, before relying on the vocational expert evidence, the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the occupational expert and information in the Dictionary of Occupational Title (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p). (Tr. 81).

A second hearing was held before the ALJ , Janis Estrada, on June 1, 2004. (Tr. 26). Testifying at the hearing were Young, Giao Hoang, M.D., a medical expert (ME), and Byron Pettinghill, a vocational expert (VE). (Tr. 26, 519).  In a decision dated September 20, 2004, the ALJ found that Young's cardiomyopathy, coronary heart disease, hypertension, and a depressive disorder were severe impairments, that his arthritis of the lower back, nose bleeds, and dizziness were non-severe impairments, and that the impairments, alone or in combination, did not meet or equal the

requirements of a listed impairment. (Tr. 27-34).  Based on the evidence as a whole, the ALJ found that Young retained the residual functional capacity ("RFC") to perform light work activity involving simple, repetitive tasks. (Tr. 32, 34).

The ALJ further found that Young could not perform his past relevant work but that he nonetheless retained the ability to perform other work such as an office cleaner, a garment sorter, and a small product assembler, all of which are jobs that exist in significant numbers in the national economy based in part on VE testimony. (Tr. 34-35).   The ALJ concluded Young was not disabled within the meaning of the Social Security Act. (Tr. 36).  Young sought review of the ALJ's decision with the Appeals Council on October 30, 2004. The Appeals Council concluded on March 16, 2005, that there was no basis upon which to grant Young's request for review. The ALJ's findings and decision thus became final. (Tr. 22).

Young filed a timely appeal of the ALJ's decision and a Motion for Summary Judgment (Document No. 17), to which the Commissioner filed a response (Document No. 19).  In addition, the Commissioner filed a Motion for Summary Judgment.  (Document No. 6).  This Appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1-571 (Document No. 3). There is no dispute as to the facts contained therein.

III.  STANDARD OF REVIEW OF AGENCY DECISION

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's

decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).

Title 42, Section 405(g) limits judicial review of the commissioner's decision: "The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive."   The Act specifically grants the district court the power to enter judgment, upon the

pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing" when not supported by

substantial evidence.  42 U.S.C. § 405(g) (2004).  While it is incumbent upon the court to examine

the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d

1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues

*de novo*, nor substitute [its] judgment for that of the [Commissioner] even if the evidence

preponderates against the [Commissioner's] decision."  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th

Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).

Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289,

295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to

be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938)).  Substantial evidence is "more than a mere scintilla, and less than a preponderance."

*Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a

suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found

only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.  BURDEN OF PROOF

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability.  *Johnson*, 864 F.2d at 344.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2003).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3) (2003).  The impairment must be so severe as to limit the claimant such that:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2003).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is 'incapable of engaging in *any* substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.      If the claimant's impairments prevent him from doing any other substantial gainful activity, taking into consideration his age, past work experience, and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Charter*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this process, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id*. Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step five that despite Young's impairments and limitations, he could perform a full range of unskilled light[3] to sedentary work[4] and given Young's age, education, work experience, and relying on the testimony of a vocational expert and using the Medical-Vocational Guidelines Rule 202.21 as a framework, the ALJ concluded Young was not disabled within the

---

[3]Light work activity "involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b)

[4] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

meaning of the Act.  As a  result, in this appeal, the Court  must determine whether substantial evidence supports the ALJ's step five decision.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  DISCUSSION

### A.  Objective Medical Facts

The medical records show that Young suffers from cardiomyopathy, coronary artery disease, and hypertension.  On December 11, 1992, Young was in a motor vehicle accident, and taken by ambulance to the hospital.[5]  (Tr. 148-153).  X-rays of Young's cervical spine showed "moderate degenerative changes are noted in the lower cervical spine.  There is no evidence of a fracture or subluxation."  (Tr. 148).  As to the lumbosacral spine, the x-ray revealed "[f]ive non-rib bearing vertebral bodies are noted.  Minimal degenerative changes are noted.  There is no evidence of fracture or subluxation."  (Tr. 148).

On July 7, 1995, Young was hospitalized because of a gun shot wound to the right buttock and inner thigh.  (Tr. 232-238).

On July 6, 1998, Young was admitted to the emergency room complaining of severe shortness of breath. (Tr. 154-162).  An ECG was abnormal.  (Tr. 161) A x-ray of the chest showed "global cardiomegaly with cephalization of the pulmonary blood flow."  (Tr. 158).  Based on these

---

[5] Young's medical care was provided through the Harris County Hospital District.  His medical records generally did not identify the location of treatment.

findings, Young was admitted to the hospital, where he remained through July 28, 1998.  He was

hospitalized from July 6 through July 28.  (Tr. 163-206).  According to the discharge summary,

> The patient was started on diuretics and ACE inhibitor and he was treated
> aggressively.  During his stay in the hospital a Cardiology consult was also obtained
> at which time it was raised whether the patient can be having a pulmonary embolism
> accounting for his heart condition.  Subsequently, the patient did undergo a CT scan
> angiogram on [July 7, 1998], which showed a pulmonary embolism in the left upper
> lobe anterior segment.  The patient was started on anticoagulation.  The patient also
> underwent a 2D echocardiogram which showed a left ventricular ejection fraction of
> 12+ in the left ventricle and thrombus.  Subsequently during his stay in the hospital,
> the patient developed severe chest pain in the hospital while on the floor and on [July
> 15, 1998] the patient was transferred to the CCU.  He ruled in for a non-Q-wave
> myocardial infarction.   Subsequently underwent a stress test and a cardiac
> catheterization.  The stress test showed moderate reversible ischemia in inferior and
> apical segments, mild intraseptal ischemia and intraseptal scar.  The patient was
> transferred to Ben Taub General Hospital for a cardiac catheterization of his non-Q-
> wave myocardial infarction.  While at Ben Taub General Hospital, the patient's
> cardiac catheterization report showed no evidence of coronary artery disease by
> cardiac catheterization.  The patient's medications were optimized during his stay in
> the hospital and subsequently, the patient also underwent dental extraction of his
> carious teeth and was followed up by oromaxillofacial surgery in the hospital.  The
> patient was discharged back to the jail on [July 28, 1998].  (Tr. 164-165).

In response to Young's complaints of hearing loss in this right ear and of being light headed,

Young was referred to Otolaryngology, Head, and Neck Clinic for an audiologic evaluation, which

he underwent on June 10, 1998. (Tr. 222-225).  In connection with the evaluation, Young underwent

an MRI, the results of which were normal.  (Tr. 220).  Also, around this time, Young was treated for

abdominal pain that was caused by constipation.  (Tr. 213-219, 223-224).  An x-ray of Young's chest

and abdominal revealed an enlargement of his cardiac silhouette.  (Tr. 221).  Young returned for

follow-up appointments for his multiple teeth extraction and hearing loss.  (Tr. 211).  The results of

another a second audiogram that was administered on August 5, 1998, showed no further loss of

hearing.  (Tr. 210).

The next series of medical records, from August 7, 1998 to April 27, 2001, reflect Young's medical care, while a prisoner of the Texas Department of Criminal Justice-Institutional Division. (Tr. 240-357).[6] According to a form entitled "Master Problem List", Young had hypertension, was deaf in the right ear, and had cardiac related problems such as cardiomyopathy. (Tr. 357). As part of Young's intake into the prison health care system, he underwent a physical examination and diagnostic tests. (Tr. 350-356). An ECG that was taken on August 7, 1998, was abnormal. (Tr. 356). The report of his physical examination completed by Dr. Stark on August 10, 1998, noted that Young had no difficulty hearing voice sounds, that he could squat fully, and touch his toes, and that he had heart failure by history. (Tr. 352). Young was assigned a low bunk and not given a prison work assignment.

On September 2, 1998, Young complained of nose bleeds. (Tr. 343). In response to his increased bleeding, his dosage of Coumadin, a blood thinner, was adjusted. (Tr. 342-343).

Also, in connection with his intake in the prison population, Young participated in a mental health screening in order to identify potential mental health needs. According to the September 10, 1998, clinic note, no current mental health needs were identified. (Tr. 340).

The medical records further show that Young frequently went to the clinic for medication such as nitroglycerin, but that overall his condition was stable, as documented in his, for the most part, monthly "Individual Treatment Plans." A treatment note, dated September 28, 1998, from The Texas Department of Criminal Justice, indicates that Young had "no problems now." (Tr. 338). On October 26, 1998, Young again complained of nose bleeds, and in response, his medication was

---

[6] Although the medical records suggest that Young might have used his cocaine, which could have contributed to or exacerbated his cardiac condition, the record shows that Young's conviction was for possession of cocaine, and at his administrative hearing, Young testified that he sold cocaine, not that he possessed the drug for his personal consumption.

adjusted.  (Tr. 336).  On November 18,1998,  Young complained of chest pain.  According to the treatment note, the pain subsided after he took nitroglycerin.  (Tr. 334).   As with all the ECG's in the record, the results were described as "abnormal." (Tr. 335).  Young was referred for a chest x-ray.  The radiologist opined that the "[l]ungs are well aerated.  No active infiltrate can be identified.  The heart and mediastinum are within normal limits."  (Tr. 331, 335).

On January 6, 1999, Young's condition was described as "stable", and according to his individual treatment plan, he was kept on a regular diet and was encouraged to exercise.  (Tr. 326).

Young reported to the infirmary on February 4, 1999, complaining of a cold.  (Tr. 323).  On March 26, 1999, Young was treated at the Oral Surgery Clinic.  (Tr. 316).  According to his May 5, 1999, individual treatment plan, Young's cardiac condition was "stable."  (Tr. 313).   Young's medication was adjusted and he was encouraged to "walk daily."  (Tr. 313).

Young complained of and was treated for nasal congestion on May 27, 1999.  (Tr. 308, 310). According to the note, Young had no shortness of breath or cough.  (Tr. 310).  Also, the medical records show that Young was treated for boils.  (Tr. 300, 307-309).

On June 15, 1999, Young went to the prison infirmary complaining of chest pain and occasional shortness of breath.  (Tr. 303).  Young returned to the infirmary on June 17, 1999, with complaints of dizziness and heart palpitations.  Because of these complaints, he was referred for an echocardiogram. (Tr. 302).

Dr. Masood Ahmad, M.D., at the University of Texas Medical Branch, Galveston, performed the echocardiogram on September 21, 1999.  (Tr. 295).   The echocardiogram revealed, in pertinent part,

2.  The left ventricular size in normal.  There is no left ventricular hypertrophy
.

3.  The LV ejection fraction is estimated at 45-50%.[7]  Anteroseptal and hypokinesis. The overall left ventricular function appears low normal to mildly reduced.  The mitral valve is mildly thickened.  There is trace mitral regurgitation.

4.  The mitral valve is mildly thickened.  There is trace mitral regurgitation.

5.  The aortic valve is normal.

6.  The right ventricular size and function are normal.

7.  The tricuspid valve is normal.

8.  The pulmonic valve is normal.

9.  Left atrial dimension is at the upper limits of normal.

10.  The pericardium in normal.  (Tr.295).

An ECG was performed on December 7, 1999.  (Tr. 287).  Based on these findings, the treatment note suggested Young undergo a recatheterization in three months. (Tr. 294, 296).  Young returned to the infirmary on December 10 and 13, 1999.  (Tr. 284, 286).

Young had a telemedicine appointment at the Cardiology Speciality Clinic on August 15, 2000.  (Tr. 266, 267).  According to the treatment note, he had not been seen since March 21, 2000. Young reported that he had shortness of breath while walking and that he was occasionally light headed.  According to the treatment note, Young's dilated cardiomyopothy was "stable" and he was told to continue with his prescribed medications.  Likewise, Young's hypertension was "controlled on meds–same dose."  (Tr. 267).  An individual treatment plan dated October 5, 2000, shows in the exercise section of the form that Young's goal was to walk around the track, three to four times a week.  (Tr. 262).

---

[7] According to the test results, the normal value ranges for estimated left ventricular "LV"is 55-75%.  (Tr. 295).

Young's medical records show that he had a flare up on February 28, 2001. (Tr. 255-257). Thereafter, Young's April 6, 2001, individual treatment stated that Young should walk "as tolerated." (Tr. 248).

Young was seen at the Emergency Room on May 8, 2001, at which time he was out of medication. (Tr. 425-428). His physical examination was normal except for "PMI laterally displaced." (Tr. 425-427). According to the ER report, Young had "well compensated" congestive heart failure and cardiomyopathy. (Tr. 425). Young returned on May 22, 2001, for an "emergency referral." (Tr. 378, 379). A treating note dated August 7, 2001, indicates that Young had shortness of breath on exertion. (Tr. 374). His chronic heart failure was described as "stable." (Tr. 374).

In connection with Young's application for benefits, he was referred to the Medical Testing Examinations Center of Houston for an evaluation. This evaluation was performed by John E. Norris, M.D., on September 24, 2001. (Tr. 364-369). The results of the physical examination are as follows:

**General**:  General appearance is that of no acute distress.  He seems a little disdainful of the examination and somewhat of an apathetic attitude.

**HEENT**:  Eyes: reveals pupils which are round and equal and reactive to light.  The optic fundi do not show any abnormality.

**Neck**:  Reveals no gointer and no bruits.  There is no venous distention.

**Lungs**:  Clear to percussion and auscultation at this time.

**Cardiac**:  Reveals no murmurs.  The rhythm is regular.

**Abdomen**:  Reveals no abnormalities, no organomegaly.

**Back**:  Reveals pain on bending and limitation of motion of the lumbar spine is indicated.

**Pulses**:  Peripheral pulses are 4/4 bilaterally.

**Extremities**:  Reveals no edema.  The limbs are straight.  There is no limitation of joint motion.  There are no joint effusions or joint instabilities.

**Skin**:  Reveals no abnormalities.

**Musculoskeletal**:  Please see Range of Motion of Chart.  Reveals that he gets up and off the examining table without difficulty.  He walks around the room without difficulty.  He can walk on his tiptoes.  He has good finger control.  There is no atrophy.

**Neurological**:  Reveals straight leg raising to be 80 degrees bilaterally both supine and seated.  The cranial nerves are intact.  The deep tendon reflexes are 2/4 bilaterally and equal.

**Radiology Report**:  Chest x-ray
PA and lateral views of the chest are taken.  There is slight rotation to the right.  The lung fields are clear.  There are no infiltrates or effusions and the costophrenic angles are sharp.  There is no significant cardiac enlargement or altered configuration.  The cardiothoracic ratio is 13/29 cm.

Based on these clinical findings, Dr. Norris opined:

1. Chest pains and shortness of breath.  He has possible angina pectoris, although this is not exertional in character.  He probably has moderate degree of congestive heart failure although this seems to be under reasonable good control at this time.  Both of these symptoms are modest to minimal in degree.

2. Lumbar back pain, etiology undetermined.

As to any limitation placed on Young based on these findings, Dr. Norris wrote:

**Work-Related Functions**:  He has no difficulty with vision or speaking or hearing or handling of objections or sitting or standing.  There is some difficulty in walking more than 10 to 15 minutes at a time due to shortness of breath and tiredness.  He should also avoid physical activities that create chest pain.  Otherwise he has no significant limitations.  (Tr. 366).

Dr. Norris completed a separate form entitled "Range of Motion Values." (Tr. 368-369).  According to this form, Young had a limited range of motion in his lumbar spine.  For example, his range of flexion-extension was 60 degrees, and his lateral flexion, was 15 degrees, right and left.  (Tr. 368-369).

Likewise, because Young alleged depression as a disabling impairment, he was referred to the Medical Testing and Examinations Center of Houston for a psychiatric evaluation. That evaluation was performed by Manizeh Mirza-Gruber, M.D., on September 24, 2001. (Tr. 358-363). The results of Young's direct mental status examination show:

**Appearance and Behavior:**  Mr. Young was middle aged adult male. He was dressed casually in long shorts and a shirt. He had fair grooming and hygiene. He appeared somewhat forlorn and one who was reduced in weight. He was quite tearful during the interview. His attitude was reserved. Facial expressions were dull. There was some slowness noted in motor activity. There were no abnormal mannerisms. He made fair eye contact. Posture and gait were within normal limits.

**Ability to Relate**:  He was withdrawn, reserved, coherent, relevant, and logical.

**Cooperation with the Examining Physician**:  Cooperation with the examining physical was fair.

**Stream of Speech and Mental Activity**:  Speed was reduced in rate, tone, and volume with diminished quality, quantity, and productivity. There was no tangentiality, flight of ideas, or perseveration.

**Mood**:  Mood was depressed. Affect was mood congruent and tearful.

**Content of Thought**:  There were no abnormal preoccupations, thought disturbances, perceptual distortions, delusions, or hallucinations. He did admit to some passive suicidal thoughts with no active plan.

Dr. Mirza-Gruber also measured Young's sensorium and current level of daily functioning. As to Young's sensorium examination, Dr. Mirza-Gruber wrote:

**Orientation**:  He was oriented as to person, place, and time.

**Memory**:  Digit span was five forwards and none in reverse.

**Current Events**:  He knew the president but not the governor or the mayor.

**Remote Memory**:  The four past presidents were remembered as Clinton. He knew his birthplace and birth date, but not his social security number.

**Judgment**: What would you do if you found a stamped addressed envelope. "I don't know." If he discovered a fire in a crowded theater he would try and tell somebody.

**Calculations**: Serial 3's, he was only able to do to 17, he said he could not do anymore; 5+4+9, 3x5=15, and 10+6= 16.

**Proverb interpretation**: Don't cry over spilled mild, "don't cry." The grass is always greener on the other side, "I don't know."

**Similarities**: How a bush and tree are alike, they both have leaves. Apples and oranges are similar in that they are both fruit. He could not give any differences.

In addition, Dr. Mizra-Gruber considered Young's current level of daily functioning. The results of

that evaluation show:

**Activities of Daily Living**: He lives in an apartment with his mother and stepfather. He does not pay the bills. He does not cook. He has about two meals a day. He is not able to do any of the household chores or grocery shopping. There are no children living in the house. He does not drive, ride the bus, read, go to church, pay bills, go out to eat, go to school, or do anything for fun. He says since he has been released he is just staying at home, he is not able to cook, shop, or perform his chores, he just does not feel like doing anything. He just stays at home and is very sad.

**Social Functioning**: Social functioning is limited to a very few friends or hardly any at all. He mostly gets along with his mother and his girlfriend.

**Appearance and Ability to Care for Personal Needs**: Appearance and ability to care for personal needs is fair.

**Concentration, Persistence and Pace:** Concentration, persistence, and pace is poor.

Based on her psychiatric evaluation, Dr. Mizro-Gruber diagnosed Young with major depressive

disorder. She wrote:

Major depressive disorder, chronic, recurrent, moderate with no psychotic features. Mr. Young has a history of depressed mood which has worsened in the last three years secondary to his cardiac condition. He reports initial, middle, and terminal insomnia. He has changes in his mood and appetite, decreased concentration, decreased energy, fatigue, crying spells, marked anhedonia, decreased libido,

helplessness, hopelessness, worthlessness, and guilt and some passive suicidal
ideation.  He has a questionable history of cocaine abuse.

Young was assessed a GAF of 55.[8]  According to Dr. Mizra-Gruber, Young's prognosis was

"guarded" and his "insight and judgment are limited." (Tr. 361).

Also, Margaret Meyer, M.D., a state agency medical consultant who reviewed Young's file

but did not examine him, completed a Psychiatric Review Technique Form.  (Tr. 380-393).

According to this form, Young had no functional limitations relating to restrictions of daily living,

difficulties in maintaining social functioning, maintaining concentration, persistence or pace or

decompensation.  Similarly, Dr. Robert N. Barnes, M.D., a state agency medical consultant who

reviewed Young's file but did not examine him, completed a form entitled "Residual Functional

Capacity-Physical. (Tr. 394-401).  According to Dr. Barnes, Young could occasionally lift and/or

carry up to fifty pounds, could frequently lift and /or carry up to 25 pounds, could stand and/or walk

six hours of an eight hour work day, could sit for six hours out of an eight hour work, and had no

limitations for pushing or pulling.  (Id).

Young had a chest x-ray on October 15, 2001.  According to the radiologist report, Young's

lungs were clear and his heart was not enlarged. (Tr. 372).

Following Young's release from prison, his health care was provided at the People's Health

Clinic, which is affiliated with the Harris County Hospital District.  (Tr. 402-411). There, Young's

medications were refilled and his cardiac condition monitored.  On May 14, 2002, Young had an

---

[8] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to
psychological, social and occupational functioning."  *Boyd v. Apfel*, 293 F.3d 698, 708 (5th  Cir.
2001) (citing *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM-IV), at 32).
A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g.,
few friends, conflicts with peers or co-workers).  *Id*. at 34.

echocardiogram. (Tr. 407). The results of the examination revealed the following about the Young's heart:

> Left Ventricle:  Left ventricle is mild to moderately enlarged.  LV function is moderately depressed.  Overall weall motion is hypokinetic.  Septal motion is paradoxical.  Inferior septum appears akinetic.  Qualitative EF is 30-34%.
>
> Right Ventricle:  Normal Size.  Normal RV function.
>
> Left Atrium:  Left atrium is mildly enlarged.
>
> Right Atrium:  Normal size.
>
> Pericardium:  Normal.  (Tr. 407).

On May 30, 2002, Young was treated for back pain.  The treatment note shows that Young's back was tender at L2-L5, and had decreased flexion of the spine.  (Tr. 405).  Because of tenderness and decreased flexion, Young was referred for an x-ray of his spine.  The x-ray was taken on May 30, 2002, and showed "normal vertebral bodies and disk spaces.  Small anterior osteophytes" and "vascular calcifications."  (Tr. 406, 423).

Young returned for a follow up visit on August 16, 2002, at which time he reported that his back pain had improved, and otherwise, the visit was unremarkable.   The doctor wrote:  "CAD, CHF, HTN–stable."  (Tr. 403).  On October 9, 2002, Young had a follow up visit at the cardiology clinic. (Tr. 413).  According to the largely illegible treatment note, Young has "improved on medical management despite EF of 15 [percent] JVP [less ] than 10 chest clear [ ]  PMI diffuse."  (Tr. 413). Also, it appears that the doctor changed most of Young's medications and added some new medications. (Tr. 413).

Young was hospitalized March 1 and 2, 2003, for cardiac related problems.  (Tr. 435-448). A chest x-ray revealed "no evidence of acute cardiopulmonary disease."  However, the silhouette of

the heart was within the "upper limits of normal." (Tr. 447).  Upon discharge, Young was instructed

to continue with his prescribed medications and to exercise as "tolerated."  (Tr. 444).

On May 27, 2004, Young returned to the emergency room complaining of chest pain that had

not resolved with nitroglycerin.   Young was diagnosed with atypical chest pain, likely

musculoskeletal, because the pain was reproducible on palpitation at L4-5. (Tr. 450- 455).

Young has been prescribed the following medications by his primary physician, Dr Ali:

Spironlactone (25mg) for high blood pressure, Tedral/EL/CR (100mg) for heart condition, Enalapril

(20mg) for heart condition, Aspirin (325mg) for pain, Lanoxin (0.25mg ) for heart condition, Zocor

(40mg) for high blood pressure and heart condition, Furosemide (40mg) for fluids, and Nitrostat

(dosage unknown) for heart. (Tr. 461).

At the administrative hearing, Young testified about his health and its impact on his daily

activities.  He offered no testimony or corroboration from his family or friends concerning his

complaints about his condition.  Young testified that his medical condition hasn't gotten better but

has stayed the same.  (Tr. 523).  Young testified that while in jail from February 2003 to February

2004, he was medically unassigned and did not participate in any recreational activities.  (Tr. 524).

Young testified that when he has chest pains, he takes nitroglycerin.  He further testified that  for his

most recent hospitalization in May 2004, after taking three nitroglycerin pills, his chest pain did not

abate so he went to the hospital.  (Tr. 532).  In addition, Young testified that his medications make

him drowsy, tired and nauseous.  (Tr. 534).   According to Young, he cannot work all day, even

sitting, because "I'm always tired."  (Tr. 534).

In this case, the ALJ sought the assistance of Dr. Hoang, M.D., to evaluate the medical

evidence available.  Dr. Hoang testified that Young met the listing for cardiomyopathy in July 1998

when he had severe cardiac heart failure with an ejection fraction of less than twelve percent but that

by September 21, 1999, his condition no longer met the listings because his ejection fraction by

September 21, 1999, had improved to 45-50%, and was 30-34% on May 14, 2001, both of which

exceed the 30% or less ejection rate that is required to satisfy the Listing.  (Tr. 538-540, 546).  Dr.

Hoang opined that since May 14, 2001, Young could perform light work.  (Tr. 543, 559).

Upon questioning by Young's counsel concerning what could have caused the changes in

ejection fraction in September 1999 (45-50%)  to May 2002 (30-34), Dr. Hoang explained:

> A.  And let me finish.  And when you have that kind of condition, even though you
> have the cardiomyopathy, you cannot correct it all the way, 100 percent.  But with
> proper management, you can improve it with the use of ACE inhibitor.  In this
> instance, he's taking the [inaudible], which is an ACE inhibitor.  It will help the heart
> to remodel.  So when you take that medication, and you take it faithfully, your heart
> will get better.  You may not get completely 100 percent better, but it does– it will
> get better, and we have seen that, you know.  He was close to death with an ejection
> fraction of 12 percent.  A year later, it was back up to 40 percent.  And then in 2002,
> it came down again to 30-34 percent.  And you asked me how that happened?  I'll tell
> you why.  Because when you have cardiomyopathy, you don't recover completely,
> but you also have to take your medication faithfully.  And when he's under the care
> of the doctors – when he was in jail, he was taking his medication very faithfully.
> When he was released from the hospital, sometimes you run out of medication.  They
> had to go to the ER, and he was out of medication.  They had to put him back on
> medication.  And sometimes when you know that you have a cardiac condition, and
> you don't take your medication, you will make it worse.
>
> Q.  So it's your testimony that the medical record indicates that the reason why his
> ejection fraction was low is because he was not taking his medication?
>
> A.  No, I didn't say that.
>
>                              *                              *
>
> A.  Because it is a very complicated case.  When you have a cardiac condition, you
> have to follow the doctor's orders.  If you relent, you will make it worse.  And on top
> of that, his medical condition alone, the cardiomyopathy, can also get worse because
> it's a fact of life.  We get older.  So when we get older, we get– all our system will
> become weaker.
>
> Q.  May I ask you some questions about your statement, Doctor?
>
> A.  Yes.

Q.  Is there anything in the record to indicate that he did not take his medication as prescribed – is the reason why he had this low ejection fraction of 30-34 percent?

A.  No. I–

Q.  Second question, Doctor.  Is there anything in the record to indicate that his low ejection fraction or his heart problem was produced because of cocaine?

A.  They were questioning about use of cocaine, but as I testified earlier, there was always a question.  But there was never any proof because we don't — I tried to look, but I didn't see any evidence of any drug screen being done.

*                                  *

A.  Well, as I said, to meet the listing, he has to have an ejection fraction of less than 30 percent.  And the ejection fraction that we were seeing her on 11F, page 6 showed that he has within 30-34 percent.  So therefore, it has not been less than 30 percent. It is more than 30 percent.

Q.   Does it equal a listing, Doctor?

ALJ:  For 12 consecutive months' duration.

Q.  Yes.

A.  It's difficult for me to say because I'm trying to think, because we don't have a good physical examination performed on him.  We have a good examination performed by Dr. [Norris] on September 24, 2001, okay?  So we have an evaluation on Exhibit 7F.  But on that date when the echocardiogram was done, he was apparently having some kind of chest pain.  That's why they did the echocardiogram on him.

*                                  *

A.  Okay.  Now as far as his ability to do work, really, I can only give an estimate because I don't take care of the patient.  I don't see him on a day-to-day basis.  (Tr. 550, 551, 553, 558).

B.  Treating and Expert Opinion

Young argues that the ALJ failed to comply with the January 12, 2004, Order of the Appeals Council.  According to Young, the Appeals Council remanded the case for resolution of several issues, namely:

A consultative examination in September 2001 noted that the claimant would have difficulty walking more than 10-15 minutes due to shortness of breath (Exhibit 7F). In October 2002, it was noted that the claimant had an ejection fraction of 15% (Exhibit 12F). The Administrative Law Judge did not discuss these restrictions or their impact on the claimant's ability to work.

The decision found that claimant did not have any mental limitations. However, a consultative examination in September 2001 noted that the Claimant had a Global Assessment Functioning (GAF) of 55, which represents moderate symptoms. The Administrative Law Judge did not discuss this opinion or provide rationale why he was not accepting it (20 CFR 404.1527 and 416.927). (Tr. 80).

And, in addition, the Appeals Council specifically directed the steps that the ALJ must follow on remand such as requesting Young's treating and examining sources to provide additional evidence and/or further clarify statements about what Young can do despite his impairments, obtaining additional evidence concerning Young's cardiac and mental impairments, including updated medical record from treating sources, and records from consultative cardiac and psychiatric examinations. According to Young, while the ALJ did utilize the services of a medical advisor, an Internist, the ALJ, nonetheless, did not comply with the spirit of the Appeals Council's directions. In response, the Commissioner argues that the ALJ followed the Appeals Council's Order, that the ALJ properly evaluated the medical evidence, and in light of the testimony of a medical advisor, concluded that Young had the residual functional capacity for light work that involves simple, repetitive tasks.

B. Diagnosis and Expert Opinion

Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Furthermore, "[a]

treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d at 176).   The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Newton*, 209 F.3d at 455.   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (5th Cir. 1995) (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).   Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of expert medical opinions of a claimant's treating physician.   Under 20 C.F.R. § 404.1527(d)(2), consideration of a treating physician's opinion must be based on:

1.   the physician's length of treatment of the claimant,

2.   the physician's frequency of examination,

3.   the nature and extent of the treatment relationship,

4.   the support of the physician's opinion afforded by the medical evidence of record,

5.   the consistency of the opinion with the record as a whole, and

6.   the specialization of the treating physician.

*Newton*, 209 F.3d at 456.   While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.   *Id*.   The Social Security Regulations provide guidance on this point as well.   Social Security Rule 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record only means that the opinion is not entitled to 'controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements", the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R.     § 404.1527, providing appropriate explanations for accepting or rejecting such opinion." *Id*.

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.§ 404.1527(d).  *Newton*, 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id*, at 455.

Here, the undersigned Magistrate Judge agrees with Young that the ALJ erred in failing to explain in his decision why he rejected the opinions of the two examining consultative physicians, Drs. Norris and Mirza-Gruber, without re-contacting them for clarification of their opinions or by sending Young for a consultative cardiac evaluation and psychiatric evaluation.  The ALJ summarized Young's medical history, highlighting his improvements, and then based on the evidence and testimony of the medical advisor, Dr. Hoang, concluded that Young could perform light level work.  However, the only consultative examinations, and for that matter, most comprehensive and thorough examinations, in the record were those performed by Dr. Norris and Dr. Mirza-Gruber on September 24, 2001.  Indeed, Dr. Hoang commented on the absence of a good

physical examination, and suggested that its absence made it difficult to fully understand and opine about Young's functional limitations.

With respect to Young's allegations that he is disabled due to cardiomyopathy, it is undisputed that Young has cardiomyopathy, and that as a result of cardiomyopathy, his ventricular function has been impacted.  For instance, an echocardiogram performed on July 8, 1998, showed that Young's ejection fraction was 12 percent but that following a cardiac catheterization, his ejection fraction increased to 15 percent.  Thereafter, an echocardiogram in September 1999 revealed that Young's ejection fraction was 45-50 percent, with the normal range being 55-75 percent. However, by May 2002, an echocardiogram showed Young's ejection fraction was 30-34 percent, and a medical note dated October 9, 2002,[9] states:  "[patient] has improved on medical management despite EF of 15 [percent], JVP [less than ] 10, PMI diffuse....no evidence of edema."  (Tr. 413).

 According to Dr. Hoang's testimony, the record read's "despite *initial* EF of 15%."  Even though this was not the case, the medical advisor apparently based his opinion on it, and the ALJ relied on this erroneous testimony.  It was unclear from this record, where the figure came from, such as the information could have been historical as suggested by the Commissioner or could have indicated a further deterioration of Young's EF rate.  Given the importance of this ejection fraction rating in establishing whether Young meets or equals the Listing for cardiomyopathy, which requires an EF rate of 30% or lower, and further given the affect that such a rate has on Young's functional abilities, the ALJ should have recontacted Young's treating cardiologist or referred him for a cardiac consultative examination to determine if the value was an old value or if there had been a deterioration in Young's condition.

---

[9] The handwriting of the medical note is difficult, if not impossible to decipher.

With respect to Dr. Norris' September 24, 2001 evaluation, it is only physical examination of Young in the record, and as such, the opinions rendered by Dr. Norris bore more evidentiary weight than those by non-examining, non-treating physicians.  Moreover, Dr. Norris' findings that Young would have some difficulty walking more than 10 to 15 minutes at a time due to shortness of breath and tiredness and that he should avoid physical activities that create chest pain, were supported by and consistent with Young's  medical records, which show that he complained of shortness of breath on June 15, 1999 (Tr. 303), on August 15, 2000 (Tr. 266, 267), on May 1, 3003, his cardiac silhouette was the upper limits of normal and he was afraid to exercise (Tr. 447), and on May 27, 2004, his chest pain was described as musculoskeletal and reproducible on palpitation at L4-5 (Tr. 450-455).  Here, the ALJ did not discuss Dr. Norris' restrictions or their impact on Young's ability to work because he speculated that Dr. Norris was unduly swayed by Young's subjective complaints.  However, given that Dr. Norris' examined Young, and his opinion was supported and consistent with the other medical records, the ALJ should have either recontacted Dr. Norris for clarification of his report or sent Young for another examination to resolve ambiguities in the record because there was not enough information in the record for the ALJ to make an *informed* decision.  Even though the ALJ does not have the burden of proof at the first four stages, the ALJ does have a duty to fully and fairly develop the facts relevant to a claim for benefits.  *See Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996); *James v. Bowen*, 793 F.2d 702, 704(5th Cir. 1986); *Kane v. Heckler*, 731 F.2d 1216, 1219-1220 (5th Cir. 1084).  The failure of the ALJ to comply with this duty to develop the record constitutes error and results in a decision that is not supported by substantial evidence.

Indeed, when existing medical evidence is inadequate to make a disability determination, the Social Security Regulations impose a duty on the ALJ to develop the record by recontacting a

claimant's medical sources or referring the claimant for a consultative medical examination.[10]  In

addition, Social Security Ruling 96-2p states that additional evidence or clarifying reports may be

necessary when the treating source's medical opinion appears lacking or inconsistent.  Similarly,

Social Security Ruling 96-5p requires the ALJ to make a reasonable effort to recontact a treating

source who offers an ultimate opinion for clarification of the treating source's reasons when the ALJ

cannot ascertain the basis of the opinion from the case record.  As such, where the existing medical

evidence is inadequate to make an *informed* disability determination, the Commissioner has a duty

to develop the record by recontacting a claimant's medical sources or by referring the claimant for

a consulting exam.  Here, not only did the applicable social security regulations require that the ALJ

either recontact Young's physicans or send him for an evaluation, the ALJ was directed to do the

same by the explicit directions set forth in the Appeal's Council's Order.

Likewise, Young argues that the ALJ failed to follow the Appeals Councils instructions

concerning the opinion of Dr. Mirza-Gruber.  Again, the undersigned Magistrate Judge agrees with

Young that the ALJ did not fully develop the record on this matter and instead rendered his own

---

[10] 20 C.F.R. § 404.1512 provides:
(e) Recontacting medical sources.  When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions:
(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques...
(f) Need for consultative examination.  If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense.  20 C.F.R. § 1512(e)-(f).

medical opinion when he concluded that Young's test scores did not constitute a rating of "poor" as

to concentration, persistence and pace.  The ALJ summarized Dr. Mirza-Gruber's medical findings

as follows:

> The mental status examination by Dr. Mirza-Gruber revealed some slowness in motor activity.  He was able to perform simple math problems and digit span was five forwards and none in reverse (Exhibit 6F).  There is no ongoing documentation of problems with concentration.  There is no evidence that the claimant has ever been hospitalized for a mental impairment and there is no evidence that he has sought treatment for depression.  The functional limitations as a result of the depression have not reached a listing level severity.

> \*                                                  \*

> The claimant underwent a consultative examination in September 2001, at which time he expressed multiple symptoms associated with depression.  The mental status examination revealed a depressed mood, congruent and tearful affect, slow motor activity, reduced speech in rate, tone and volume, an ability to perform simple math problems, and no abnormal preoccupations, thought disturbances, perceptual distortions, delusions or hallucinations.  The claimant appeared forlorn and was tearful during the interview.  He was diagnosed with a major depressive disorder and given a global assessment functioning of 55 (Exhibit 6F).

> \*                                                  \*

> Although the claimant alleged he was depressed, he testified that he was not seeing a mental health professional, a factor that indicates that his symptoms are not as severe as alleged.  It was alleged that the claimant's concentration, persistence and pace were poor (defined as no useful ability to perform these activities).  Although Dr. Mirza-Gruber stated that the claimant had poor concentration, persistence and pace, the mental status examination revealed that he could perform simple math problems, and digit span was five forwards.  Although there were abnormalities on the mental status examination as summarized above, this was a one time exam and there were no treating notes related to a mental impairment as the claimant has not sought treatment.  The burden is on the claimant to prove disability.

Here, as mentioned by the ALJ, the only mental evaluation was that of Dr. Mirza-Gruber.  To the

extent the ALJ discounted Dr. Mirza-Gruber's report based on the ALJ's interpretation of the tests

administered to Young, which led the ALJ to conclude that Young had no problems with

concentration, persistence and pace, the ALJ is not a trained psychiatrist and is not qualified to

render such an opinion.  Rather, the ALJ should have recontacted Dr. Mirza-Gruber to clarify her report or sent Young for another consultative evaluation.

In conclusion, upon this record, the ALJ failed to properly develop the record, and on remand, should assess the medical opinions in accordance with the proper legal standards.

C.  Subjective Evidence

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750, F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Seders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hams v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Because the ALJ made and supported his credibility determination based upon his residual functional capacity assessment, which should be reconsidered on remand because that assessment is inextricably intertwined with the expert opinion factor, this factor neither weighs in favor of or against the ALJ's determination.

D.  Education, Work History and Age

The final element to be weighed is the claimant's educational background, work history, and determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but present age.  A claimant will be cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A) (2006).

Given that the matter should be remanded for further record development, which may affect the ALJ's assessment of Young's residual functional capacity, which was incorporated in the hypothetical questions posed to the Vocational Expert, on remand, the ALJ should reconsider Young's ability to perform his past relevant work or any work.

VI.  CONCLUSION

Based on the foregoing, and the conclusion that a further development of the record is necessary because substantial evidence does not support the ALJ's finding that Young could perform light work, and because the ALJ failed to apply the proper standards in evaluating medical opinions, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Court

ORDERS that Plaintiff's Motion for Summary Judgment (Document No. 17) is GRANTED, Defendant's Cross-Motion for Summary Judgement (Document No. 6) is DENIED, and this case

is REMANDED to the Social Security Administration pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.

      Signed at Houston, Texas, this  31st  day of  Augsut, 2006.


Frances H. Stacy
United States Magistrate Judge